Case 18-2035 and 18-2120 Hana Durasevic v. Grange Insurance Co. of MI Argument not to exceed 16 minutes per side. Ms. Davis, you may proceed. Good morning, Your Honors. May it please the Court, Joe Robin Davis, appearing on behalf of Mr. and Mrs. Durasevic. I have asked for five minutes to be reserved for rebuttal. All right. This is a very interesting factual situation. Mr. and Mrs. Durasevic had a home which sustained a fire in 2015. At the time, they were insured by Grange, the defendant in this case. Grange accepted liability for this, I think it was a cooking fire. It was an accidental loss. And they paid out a substantial amount of money, over $600,000 with respect to that claim, which included paying for the family, and it was a large family, a son, two sons, a daughter-in-law and some kids, and them to live elsewhere. So at the time of the second fire, which occurred on April 29th, I believe, 2016, the family was living at an alternative home being paid for by Grange Insurance. One of the sons, Nico, the evidence established, got roaring drunk at a bar, and a good Samaritan, and we have videos of this, which is kind of amazing, a good Samaritan went over to him as he was practically passed out asleep on the bar and asked him if he wanted a ride home. He didn't respond. They looked into his pocket. They found his driver's license. His driver's license had the family home's address. She drove him to the home which had suffered the previous fire. Sometime that evening, that night, the next morning, it was discovered that a fire occurred at that house again, another fire. So at that point in time... The facts are interesting, but so is the insurance policy. And so it seems just so clear. It just says submit to examinations under oath by any person named by us while not in the presence of any other insured person, and sign the transcript. There's very obvious reasons for doing this. Of course. And so it's beyond me why it wasn't done. I don't know, but, you know, if you have a... If you don't know, that leaves me in a place where all I have is the policy. Well, you have the policy. It doesn't matter about his being drunk. Well, first of all, the facts are interesting for other issues as not with respect to that one. That issue to me is a nonstarter for the reason that I'm a named insured. I have to appear at an examination under oath. If I want to make a claim, I have to appear at an examination under oath. I can't find somebody off the street or find another... If it says insured person means you, your relatives residing in your household. And how can you control your daughter-in-law, who was the other person who did not appear for an examination under oath? You have a claim. She doesn't want to appear. You can't... It says residing in your household. That seems fair. Well, it's not if she won't go. The daughter-in-law refused to attend the examination under oath. Most policies state if you have a duty or an obligation to ask these people to appear at an examination under oath. This thing, this policy does not have that language. Here... It doesn't bother me at all that people won't show up and now the quote insured is stuck. I mean, what was her problem or his problem? What, they were too busy drinking? No, he... If you want the $330,000... But he didn't ask for it. His parents asked for it. He did not ask for it. He did not make a claim. It's the same as those proof of loss cases where the wife doesn't sign. Don't sign the insurance policy. He didn't have the insurance policy. His parents did. The parents should not sign something if they can't control the people living in their house. That's simple, very simple. Well, I think the law in Morgan and the innocent co-insured cases, which I'm not arguing this is an innocent co-insured case, you often cannot control the conduct of other people. And frankly, if he was being... And I don't know, but NICO may have been... Is there a Michigan case dealing with this innocent person exception that relates to failure to follow, adhere to a conditioned precedent for getting coverage? Because the cases you cite are not that. I'm just curious if that case exists. Well, we do have those cases. In Morgan, it is not that case, Morgan v. Cincinnati, but that is an innocent co-insured case. But we're in Michigan. I am in Michigan, yeah. In Burns v. State Farm, which was a Michigan case, Mr. Burns' second wife, Lisa Burns, was not a named insured. She was a resident relative. She did not sign the sworn statement of proof of loss. So you know what I'm asking. It has to be an innocent case. That's the line of cases you're in. But be applying it to a situation where a conditioned precedent for getting coverage was not followed. In other words, that becomes the explanation for not following the conditioned precedent. That's what I'm trying to get at. Well, I don't think the innocent co-insured policy argument even applies in this circumstance. They're not innocent. They didn't appear for an examination under oath. Mr. and Mrs. I'm fine if the innocent exception doesn't apply. But what I'm saying is in the Morgan case, the Morgan v. Cincinnati, which is a Michigan Supreme Court case, the insured, it said an insured often has no control over the conduct of others. I would imagine that Mr. Niko Dorosevic's criminal attorney might have told him, you can't testify at an examination under oath. I have no idea. I do not know why they didn't testify. But I represent the plaintiff named insureds. And the plaintiff named insureds appeared for their examinations under oath. And under Michigan law, the cases going back to Remind me how old Niko and Samantha are. I don't have that. Early 20s? I would guess. Early 20s? Samantha's a mother of children. I would say 20s. Niko's in his 20s, I believe. I mean, this kind of thing comes up all the time in our current world. So in our current world, you can insure your kids up to age 26. But that's for health insurance. Stick with me. You can do this up to age 26. Suddenly you want to have a claim for your son gets hurt and you want to process it. And the insurance company says, well, wait, we want to talk to the kid. We want to see what happened and make sure this didn't fall under this exception or that exception. The kid says, hey, I'm my own free agent. I'm not showing up. I'm busy. The insurance company is going to laugh at the idea that I still get coverage. It's kind of a tough luck situation. If they want to investigate whether there's really a problem, they get to investigate. That's what it says. I don't hear you arguing that his testimony is not material. Well, I was going to get to that. It isn't material. The evidence that we know that he was there, it's not material. Let's assume that he intentionally set this fire. Okay? Let's assume the worst. He cannot recover. His parents can recover. They're the named insurers. They are the innocent named insurers. Under Borman v. State Farm, which was my case, under that case, the court said, the Michigan Supreme Court said, the innocent insureds recover. Okay? So we've got that situation. So the parents would recover if he said it or he didn't say it. I don't know if he said it or he didn't say it. It's a strange circumstance. But the facts are such that they, the parents who bought the policy, who continued to pay the premiums under the policy, and for which Grange accepted premiums during the period of time when they were out of the house, and Grange knew they were out of the house, and knew the whole family was out of the house. I think the interesting issue in this case is not the appearance for an examination under oath, because a condition precedence such as a proof of loss, the person who doesn't appear is out. Nico could not get his contents. The daughter-in-law could not get her contents. She's not entitled to that because she didn't pursue a claim properly. She didn't appear for an examination under oath. She's an adult. How about your clients and all the bank records, tax records and stuff? Did they supply everything? No, they did not. And the question then becomes, for substantial compliance, is that material? Grange just paid them $600,000. Grange had a release which said, you can, in fact, get whatever documents, whatever documents you want. When I go to an examination under oath, generally the insurance company's attorney asks, well, if you don't have the documents, you want to just sign this form and we can get them from the government. Didn't ask for that. They never even asked about anything financial. They asked who was where and whether or not the home was vacant, which I think is the most interesting part of this case, because I think that the case with the policy language says vacant. It doesn't say vacant or unoccupied. And for that reason, this home was unoccupied under law. It was certainly not vacant. Thank you. Thank you. Good morning, Your Honors. My name is Jason Walker. I'm here for Grange Insurance Company of Michigan. I'd like to start off with where Ms. Davis left off regarding the materiality question as to the documentations that the jurisdicts did not produce. The Michigan case law that we cited does say directly that financial records generally are relevant in the context of an insurance company's investigation into an intentionally set fire. There's also a case law that we cited which specifically says that of those financial documents, things like tax returns are absolutely relevant in the context. What were you going to get with these records? What was the theory here? We're trying to figure out if the family was under any type of financial strain as one issue. If you're under financial strain, do people assume you're an arsonist? No. That assumption has been with me ever since my kids started going to college. When the insurance company is investigating the potential for an intentionally set fire, meaning there's possible policy exception, then it would be on the burden of the insurance company to prove means, motive, and opportunity. Motive, one of those motives can be financial, so financial documentation. What else would there be? So you could find out they're under financial stress. What else would it show? That's all the... Do you have enough to figure out if they did give a lot? That wasn't enough to figure out whether they were under financial stress? I don't know that they gave a lot, and I don't know that they didn't give any financial documentation. So we don't have anything to evidence their condition, other than what Grange obviously knew they were paid on the previous fire. But, of course, that's not income. It's not tax. It's only to try and make them whole from that last fire. So in terms of how they were sitting financially, whether they were able to pay their bills, whether they were reporting income or not, whether they had multiple means of income, we don't know. So we didn't have that documentation to discuss with them at their examinations under oath. And on that point, I conducted the examination under oath of Mr. and Mrs. Drusevic and spoke with them specifically regarding those pending document requests. And I went over with them point by point the documentations that Grange was requesting and that they had not produced those and that they needed to produce those and that the failure to do so might constitute a breach of the policy terms. I'm confused. I must be missing something. I thought they did give a fair bit. So you're saying they didn't give anything that told you anything about their financial status? They did not give anything about financial status. They did produce other documentation, but nothing that related to finances. Nothing, no bank statements, no tax records? That's right. And those were issues that we discussed with them specifically at the examinations under oath. But they did produce other documentation in response to Grange's other requests, but those particular records they did not produce. Can you respond to opposing counsel's take on materiality of Nico's testimony? So we obviously don't have Nico's testimony, so there's nothing there to just figure out if it was material or not. But Nico was certainly the person that we knew was at the lost location in the hours leading up to the fire. He admits that he's hypothetical. You have your examination. He admits, oh, yeah, I set it. Okay. So in the event that Nico were to admit under oath that he set the fire, obviously that would then tell us that he was there, he did it, and we would know that the exclusion for intentional acts would apply to Nico. Now, I completely agree with counsel that the Michigan law does follow the innocent co-insured doctrine and Nico's bad acts would not be attributable to Mr. and Mrs. Duracevic. And the coverage position letter which Grange sent to the Duracevics through their attorney specifically pointed that out, that to the extent that Nico was involved, it would bar his recovery and his recovery only if they were relying solely on the intentional act provision. But the intentional act provision was only, I think, the last of five reasons asserted in that coverage position letter. What were the other things they were going to figure out? Well, the other reasons for the denial were the vacancy provision, the failure to perform the condition proceeding regarding the examinations under oath, the lack of cooperation, and misrepresentations. I'm getting at what are the other things they could have gotten out of Nico. Maybe I'm missing something here, but if the thing you could get from Nico is he set the fire, but that wouldn't change coverage as to the family, what is the material thing you'd have gotten out of Nico in the examination? Just the involvement, right? Just was he there, did he set the fire? Those are obviously material questions to the insurance company's investigation. We never – Nico pled guilty, I believe, to a lesser charge, to breaking and entering. So he was not convicted of arson. And we never got to talk to him about his whereabouts and activities that night, whether he was inside the house. Because if Nico's going to say he didn't do it, right, then that would change the analysis as to him. Plus, we know that there were – the Duracevics, the mother and father, did talk to police. And there were inconsistencies in the statements that they provided to police and to Grange. So we're trying to also determine whether they had any knowledge of Nico's involvement and whether they were providing information to Grange that was honest and forthcoming. I take it it would not be a legitimate reason to insist on the examination to try to find out if he had any role in the first fire. That would not be legit, would it, because it's been paid? Oh, absolutely, correct. It would be legit. No, no, it would not – there would be no basis to request an EUO after having already acknowledged coverage for the first fire. That's right. And all those – the requests that we made to the Duracevics related solely to the second fire. So the condition of the house obviously was an important part of that decision for the second fire. The vacancy provisions in this particular policy use only the one word, vacant. And I know counsel was just kind of getting to that at the close of her initial statement. We believe that Judge Drain got two of the three requests right in our motion for summary judgment. We requested judgment based on the failure to perform the condition precedent and the non-cooperation and the vacancy. Judge Drain did find that the house was vacant, but then found that there was a question of fact regarding whether Niko started the fire and whether he had the intent to start the fire. And therefore, Judge Drain felt that that precluded application at summary judgment level of the vacancy provision. The vacancy provision is not concerned with the intent of a given person. It just says specifically that if the house is vacant for more than 60 days before the loss and if the loss results from an intentionally set fire, then the vacancy exclusion is triggered. But it doesn't require the insurance company to prove who set the fire. So there's obviously an intentional act exclusion elsewhere in the policy, but that is completely and entirely separate from the vacancy provision. The vacancy provision is neutral with regard to the person or persons who actually started the fire because the vacancy provision is concerned only with the risk posed by a vacant structure. So there's no question that the house was not being constructed, and under construction is an exception to the vacancy exclusion. And when I sat down with Mr. and Mrs. DeRosier, they both confirmed, to my surprise, that absolutely no work had gone on in the six months after the first fire and before the second fire, despite the fact that Grange had paid a substantial amount of money to them for the dwelling. And that check had been issued and actually put into the bank. So the funds were there to do the work, but they both admitted they hadn't even decided on a contractor. So nothing had been done. So there was no concern regarding... It takes you back to the examination of the son. I mean, you have the theory that it's the son alone, but you also have the theory that it's the son talking to the parents. That's right. Again, their knowledge of his activities and potentially their connection to it are certainly questions that Grange was investigating. Because of the delay in starting construction, most people have a house fire or other type of loss, and they want to get back in that house as soon as possible. So they start, especially if they're getting paid by the insurance company, they're starting work. If there had been some dispute over coverage and maybe it hadn't been paid yet or only partially, there might be some reason why the neurosettings hadn't started working. But that's not the case here. Here we've got a fire. It was paid. It was paid promptly. It was paid fully. There was no dispute over the amount that was paid. They simply chose not to do anything. So that was obviously a concern from the insurance company's side when you're investigating the second fire as to why no work had started at this house if they actually intended to do the work. So, yes, Your Honor, that would buttress the argument for the materiality of Niko's testimony had he sat down for it. Grange asserts that the house was vacant. The policy uses only one word, vacant. The appellants argue that there are other policies out there that use the words vacant and unoccupied, and because other policies use those words, then that creates either an ambiguity in this policy or it suggests that vacancy, according to its definition in other policies, should be similarly construed here. And in that instance, it would mean that Grange was concerned with not just the presence of people but the presence of contents in the house. And as Judge Drain noted in his decision, the vacancy provisions serve to address a risk posed by a house with a lack of people, where people aren't living there. It does not matter to that risk whether there are contents or personal property in the house. So if vacancy is read to include or require the complete absence of personal property, then it results in a ridiculous outcome. Because you can have a house where no one has lived for quite some time, but if there's an end table or a chair left in there with personal property, then conceivably that provision would not be triggered. Thus, it would be impossible for Grange to limit its risk regarding a vacant structure. So we believe that Judge Drain correctly decided the issue of the vacancy. We just believe that he conflated different provisions and the different exclusions and included an additional requirement in the vacancy exclusion, which doesn't exist. As to the non-cooperation, we've already discussed that the case law is pretty clear that the records requested relating to finances, such as tax returns, are material. And that by failing to produce those, that constitutes material non-cooperation. We believe Judge Drain correctly decided that issue. Materiality and substantial compliance are not relevant in the context of the condition proceeding for the EUO. That's a black or white, it either happened or it didn't analysis. If it did not, then the policy cannot obligate Grange to pay the claim. Under the suits against us provision, the language specifically says, we may not be sued absent full compliance with the policy terms and conditions. By NICO and Samantha Duracevic not submitting to their examinations under oath, there was not compliance with all the policy terms and conditions. Therefore, the policy by its expressed terms says that Grange may not be sued. So there's case law to that effect that we've cited in our briefs. I believe that Judge Drain also correctly decided that issue. Your Honor, I failed to address this earlier, and I don't know if I can now. If I can't, that's okay. But we do have the cross appeal. I don't know how that operates in terms of rebuttal time, if I'm allowed rebuttal time or not. If I am, I'd like to take it. If not, I've frankly discussed everything I need to tell you. Go ahead and include that in your argument at the present time. I would like to reserve my remaining time for rebuttal if allowed. I think he was saying, say what you have to say right now. I was actually saying that because I'm not sure what my counsel is going to say on her rebuttal. And so I don't have anything more to tell you. We may have made arrangements regarding that in advance, but since we did, and I think you should address it now if you intend to. Your Honor, I don't have any more to address with you. I believe I've addressed everything I need to. Thank you very much. Your Honors, I think we have to look at the policy language and not talk about this, the reason the vandalism exclusion has a vacancy provision applies. We look at the language in the policy. And the language in this policy says vacant. It doesn't say vacant or unoccupied. Under the law in Michigan and throughout the country, vacant and unoccupied are not synonymous. Otherwise, why have two words? I mean, it just doesn't make any sense. And for the insurance company to say, now, well, this is our policy, this is the reason we did it, why couldn't they just have added the language or unoccupied and there would have been no question? It is ambiguous in that they chose not to be specific. And this house did not just have an end table. This house was fully furnished. And I think I went through in my brief the testimony of Mr. Pike as to all the contents that were in the home. So this was ‑‑ What does the record show about why they hadn't started on the first fire? What does the record show about that? The examination under oath testimony that Mr. and Mrs. Jarosik gave was that they were having trouble deciding upon a contractor. And they have since finished the house. Remind me, what was the period of time? Six months. Which really isn't a tremendously long period of time to not make a decision as to how to rebuild this very large home. But I think based on the policy language in Michigan law, only claims of those who refuse to submit to an examination under oath, just as only those who refuse to comply with the proof of loss provision, their claims are denied. The policy does not talk about denying the claims. You said on the records point, because this is the family's obligation, that there was nothing passed along that showed their financial status. Was there something that showed how they were doing, whether bank records or tax records? Well, they were very little. There was very little given. And the fact is that they were, in fact, just handed a substantial check from the insurance company that was in the bank and not being used to build their house. We know that. I'm just curious if there was anything else passed along. There was a lot of documentation. I think he's correct in that the tax returns were not provided. I'm just saying anything that showed how they were doing financially. No. I can't see that in your brief you raised the question of whether NICO's testimony was material, because even if he did cause the fire, the insurance company would have to pay the parents. That is true. And it is true that if he set the fire or didn't set the fire, it really is immaterial to the recovery of the parents. And I think that Grange actually admits that. I think the substantial compliance in the materiality with respect to the financial records is a question of fact under Michigan law. I also believe that the house was not vacant. Go back to Justice Cooley, who wrote, a house can be vacant but not unoccupied or unoccupied but not vacant. And with respect to the proof of loss, or excuse me, the EUO, the examination under oath, I think that you can't control other people, and the courts have recognized that. And if a kid who sets a fire, assuming he set the fire, and the kid who is the bad kid won't appear for an examination under oath, I don't know why parents should be punished again. They're doing what they can to comply with the policy provisions. And their son not appearing, they, you know, he's a bad kid. I don't think he is. I don't know him. But if he were, if he set the fire, it doesn't matter. It's also possible they cooperated. That's the conversation they want to check. Well, cooperation would be difficult considering that this was not a situation. We had a video. This kid was just roaring drunk. He didn't call his parents. They didn't know where he was. This wasn't a situation where somebody, if he did intentionally set it, did it with any forethought. It was something that occurred at the time. So I think based on these particular facts, it would not, there would be no evidence that you could get from NICO regarding anything he did. Because we had his video of what happened to him that night, and we had the testimony of the woman who took him home. He was really in bad shape. And it just does not appear under any circumstances that there would have been cooperation between the parents and the son. Otherwise, he would have gone to an EUO. Thank you. All right. Thank you. And the case is submitted. Appreciate your argument.